# NATIONAL LABOR RELATIONS BOARD v. CAPITOL GREYHOUND LINES et al.

## No. 9592.

Circuit Court of Appeals, Sixth Circuit.

Jan. 31, 1944.

Dominic Manoli, of Washington, D. C. (Robert B. Watts, Howard Lichtenstein, Frank Donner, and Sanford H. Bolz, all of Washington, D. C., on the brief), for petitioner.

Thomas L. Tallentire, of Cincinnati, Ohio, for respondent.

Before HAMILTON, MARTIN, and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

In essence, this is a labor-bargaining-agency election contest. The case comes here on petition of the National Labor Relations Board for enforcement of its customary cease and desist order, with the usual sequential directives, against the respondent incorporated bus lines, which insist that the organized Labor Union, recognized by the Labor Board, but not by respondents, as bargaining representative of the respondents' bus drivers, was not chosen appropriately to the requirements of Section 9 of the National Labor Relations Act, 29 U.S.C.A. § 159.

If the Union was chosen as collective bargaining agent in conformity with due process under the National Labor Relations Act, the order of the Board should unquestionably be enforced. Compare N. L. R. B. v. National Mineral Co., 7 Cir., 134 F.2d 424; N. L. R. B. v. Piqua Munising Wood Products Co., 6 Cir., 109 F.2d 552; N. L. R. B. v. Whittier Mills Co., 5 Cir., 111 F.2d 474.

The dispute emanates from a consent election conducted by a Regional Director of the Labor Board. The election was held pursuant to a signed agreement in form ordinarily used by the Regional Director in consent elections held under supervision of the Board. The contracting parties were Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Div. 1299, A. F. L., of the one part, and Capitol Greyhound Lines and Subsidiaries of the other.

The consent election agreement stated at the outset that the bus drivers constituted an appropriate Unit for the purposes of collective bargaining with the bus companies. The next paragraph of the agreement provided that an election by secret ballot should be conducted under the direction and supervision of the Regional Director among all employees in the Unit who were employed by the bus companies during the payroll period ending July 31, 1942. Expressly included among eligible voters were employees who did not work during such payroll period because ill or on vacation or in active military training or service. It was stipulated that the election should be held to determine whether or not the bus drivers desired to be represented by the Union for purposes of collective bargaining.

It was provided that the election should be held on Wednesday, September 2, 1942, during stipulated hours, at several specified places; and that the employers should post notices of the election, at conspicuous and usual posting places, easily accessible to the eligible voters. These notices, describing the manner of conducting the election and incorporating a sample ballot, were to be supplied by the Regional Director. The signed agreement for the consent election stated that there was attached thereto, marked Annex B, "a list which all parties agree constitutes the sole and exclusive list of eligible voters." The respondent companies prepared and furnished as Annex B a list of seventy-three names, arranged in alphabetical order.

The election agreement contained a broad vestiture in the Regional Director of final authority to determine questions as to the eligibility of voters in the following clause: "Said election shall be held in accordance with the Act, the Rules and Regulations and the customary procedures and policies of the Board; provided that the determination of the Regional Director shall be final and binding upon any question (including questions as to the eligibility of voters) raised by either party hereto relating in any manner to the election and not specifically covered in this Agreement."

Provision was made for the handling, counting and tabulation by the Regional Director of the votes cast. The employers and the Union each were to be allowed an equal number of authorized observers to be selected from non-supervisory employees, to assist in the conduct of the election, to challenge the eligibility of voters and to verify the tally of votes.

Objections to the conduct of the balloting or to the determination resulting therefrom were to be filed with the Regional Director within five days after the closing of the

polls and copies of such objections were to be served upon the opposite party. The Regional Director was obligated to investigate promptly all objections and to issue his report containing a tally sheet showing the result of the election. If objections should be sustained he was empowered to void the election and conduct a new one in accordance with the consent agreement at a date, time and place to be determined by him. Should objections be overruled, or if none should be filed, the Regional Director was obligated to include in his report a finding and determination as to whether the employees in the Unit had selected the Union as their bargaining representative. The consent election agreement was made subject to the approval of the Regional Director and received his approval August 22, 1942.

In conformity with the notices, the election was duly held on September 2, 1942. The notices of election were properly posted and were fully informative. The voting schedule attached to the notice of election gave clear directions as to the exact places in the respective cities where named employees would vote and the hours during which the polls would be open at each voting place. Notice was given moreover that "if any employee cannot vote at the place designated for him he may vote at any of the other polling places if he appears while the polls are open." The notices were posted over the typewritten signature of the Regional Director.

After the election, certifications were signed by observers for the respondents, the Union and the Regional Director, respectively, at each of the polling places that the balloting had been fairly conducted; that all eligible voters had been given opportunity to vote in secret; and that the ballot box had been protected in the interest of a fair and secret vote.

Representatives of the respondents, the Union and the Regional Director, respectively, signed a certification of the counting and tabulating of the ballots. It was certified by them that the ballots had been counted and tabulated fairly and accurately, secrecy of the ballots being maintained; and that the total number of voters on the eligibility list was 73, whereof 63 cast ballots and one ballot was challenged. It was certified over the signatures of these representatives that 62 valid votes had been counted, whereof 32 had been cast for the Union and 30 against the Union.

Tally sheets were attached to this certificate.

In due time, the respondent filed with the Regional Director "Objections to the Conduct of Ballot in Consent Election." These objections were stated to be that (1) the Regional Director had failed to make arrangements for two sick employees to vote, and that two other employees could not vote because the operation of their busses prevented their appearance at a voting place during the conduct of the poll; (2) the Regional Director had failed to provide voting opportunity to four employees, who were in the active military service of the United States at the time of the election; (3) one employee, Nolan, who had voted, was not entitled to cast a ballot for the reason that he was not in the employ of the respondents during the payroll period ending July 31, 1942, as required by the consent election agreement, even though his name erroneously appeared on the list of eligible voters set forth in Annex B; (4) the vote of another employee, Thomas, whose name appeared on the list of eligible voters, was improperly challenged and not counted.

Formal hearing by the Regional Director was had on these objections, testimony of witnesses was adduced, documentary evidence received and a transcript of the proceedings preserved. The Regional Director subsequently promulgated his report on the consent election in which he overruled all of respondents' objections and held that the Union had been duly designated and selected by a majority of the employees in the Unit as their exclusive bargaining representative.

The Union requested a meeting with respondents for the negotiation of a collective bargaining agreement in behalf of the bus drivers. Respondents replied that inasmuch as they would seek a review of the ruling, no meeting would be agreeable until the matter of representation had been finally settled.

The respondents petitioned for a review of the decision of the Regional Director and requested the National Labor Relations Board to set aside his report and order a new election. This petition was denied on the ground that no right of appeal from the Regional Director's ruling existed in view of the fact that the election had been conducted by the Regional Director in pursuance of the provisions of a consent election agreement.

After invoking the jurisdiction of the United States District Court for Southern Ohio by petition for declaratory judgment, the respondents ultimately flatly declined to negotiate with the Union; whereupon the latter filed charges of unfair labor practices under the National Labor Relations Act against the respondents for their failure to recognize the Union as the bargaining representative of the bus drivers. The usual complaint was issued by the Regional Director and served on the respondents in conformity with customary procedure, respondents answered the complaint, and a due course hearing was had before a Trial Examiner, who recommended that the complaint be dismissed.

From his Intermediate Report, it appears that the Trial Examiner agreed with the Regional Director that there was no merit in the contention of respondents with respect to the alleged failure of the Regional Director to arrange for two sick employees to vote, or in the contention that the Regional Director was derelict in his duty concerning arrangements for the voting of two bus drivers whose scheduled runs were alleged to have prevented their voting.

The Trial Examiner reasoned that no obligation rested on the Regional Director to investigate the physical condition of eligible employees and to make especial arrangements for those found ill to vote. The respondents were deemed in better position than the Director to ascertain illness among their employees. Having failed to do so and to advise the Director thereof prior to the election, the employers would not be heard to complain thereafter.

The Examiner stated that the time and place of balloting having been agreed upon after careful examination of bus schedules, the failure of two of the bus drivers to be at a designated polling place on election day could not be attributed to any dereliction of duty on the part of the Regional Director, who had made arrangements for the balloting in strict conformity with usual methods.

The Trial Examiner agreed, moreover, with the ruling of the Regional Director that he had followed the established practice of the Labor Board with respect to eligible voters who were in the armed forces of the United States. It was pointed out that the Board had found that the practice of "mail balloting" by employees in active military service had produced administrative difficulties, resultant delays, "small returns" and controversies concerning the conduct of elections; and, therefore, had held that the eligibility provisions in Directions of Elections would be construed to provide only that those employees who appeared in person would be entitled to vote in a collective bargaining agency election.

But the Trial Examiner disagreed with the ruling of the Regional Director with respect to the vote of the employee Nolan.

The Regional Director, in overruling the post-election objection to Nolan's voting, had emphasized the facts that Nolan was admittedly within the Unit and in the employ of respondents at the time of the election; his name had been submitted by respondents as an eligible voter and had been posted in all depots of the employers "for all employees to see"; respondents' observers at the election booth could have challenged his vote, but failed to do so; and the Election Agreement expressly provided that Annex B, on which Nolan's name appeared, constituted "the sole and exclusive list of eligible voters." Post-election challenge procedure was considered "not conducive to orderly and certain elections."

The Trial Examiner rationalized that the mere facts that Nolan's name appeared upon the voting schedule and that he was actually a bus driver in the employ of respondents at the time of the election would not render him eligible to vote; that the provision of the Election Agreement stating that an election would be conducted among those of the Unit who were employed by respondents during the pay-period ending July 31, 1942, should take precedence over the erroneous eligibility list attached to the Agreement; that Nolan's name had been erroneously placed upon the eligibility list and that he had been, therefore, wrongfully permitted to vote. It was found that the record failed to reveal whether Nolan voted for or against the Union.

The Regional Director, in view of his determinative rulings on the other objections of respondents, had deemed it unnecessary to rule upon the challenged ballot of the employee, Thomas. But the Trial Examiner, having reached an opposite conclusion as to Nolan's vote, found it necessary to do so; upheld the right of Thomas to vote and found that he had voted against the Union.

Summarizing the result of his findings the Trial Examiner stated:

"In accordance with the above, the undersigned finds that the ballot of John E. Nolan should not be counted, and that the ballot of Clyde O. Thomas should be counted as against the Union, which would make the result of the election show that a total of 32 ballots were cast one of which (Nolan's) is in doubt as to whether he voted for or against the Union. If Nolan voted for the Union, the result would be 31 ballots for the Union and 31 against the Union. If he voted against the Union, the result would be 32 ballots for and 30 against the Union. In view of the doubt, in respect to Nolan's vote, the undersigned is unable to find from the record that the Union, as a result of the consent election held on September 2, 1942, represented a majority of the employees in the unit agreed upon by the parties as alleged in the complaint.

"Having found that the evidence does not sustain the allegations of the complaint that the Union represented a majority of the employees in an appropriate unit, the undersigned finds that the respondents have not engaged in the alleged unfair labor practices. Therefore, the undersigned will recommend that the complaint be dismissed in its entirety."

The Union filed exceptions to the Intermediate Report of the Trial Examiner and the National Labor Relations Board reviewed the case in its accustomed manner.

The Labor Board agreed with the Regional Director and not with the Trial Examiner in the matter of Nolan's vote; and consequently found that the Union had been duly designated exclusive collective bargaining agent of the bus drivers in the consent election, and that the refusal of respondents to bargain with the Union was an unfair labor practice. An appropriate cease and desist and affirmative action order was promulgated.

After adopting with some elaboration the reasoning of the Regional Director appertaining to the Nolan vote, the Board asserted in its opinion-decision:

"The factual question of majority is bottomed upon a consent agreement which expressly provided that a determination of the Regional Director as to questions arising out of the conduct of the election, including questions arising out of eligibility of voters, shall be final and binding on the parties. In overruling the respondents' objection, the Regional Director had before him and considered the following facts. The list of eligible voters attached to the agreement was prepared solely by the respondents, was submitted by them at the time of the execution of the agreement, and, by the terms of the agreement, was the sole and exclusive list of eligible voters. Whether or not Nolan was employed by the respondents on the agreed eligibility date of July 31, was a fact peculiarly within the respondents' knowledge. Yet, not until the respondents were informed of the outcome of the election did they raise any objection to Nolan's vote. Only 2 months after the election, Graves, the respondents' vice president and general manager, who signed the agreement to which the eligibility list containing Nolan's name was attached, was unable to state that he had no knowledge prior to the election that Nolan's name was erroneously placed on the eligibility list. The respondents offered no evidence to show that Nolan voted for the Union.

"Upon these facts, we find that the Regional Director's ruling was neither arbitrary nor capricious. In the absence of such conduct, we feel ourselves bound by the terms of the agreement providing for the finality and binding effect of the Regional Director's determination to the same extent as a court is bound by an agreement to abide by an arbitrator's award. To hold otherwise would permit an employer deliberately to ignore binding commitments embodied in a consent agreement; would open the door to subterfuges for hampering and delaying a final determination of a bargaining representative; and would tend to defeat, rather than to effectuate, the policies of the Act."

This rationalization seems consistent with decisions of the Supreme Court. See Virginian R. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789; Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 119, 121, 44 S.Ct. 274, 68 L. Ed. 582.

No valid reason appears and no authority has been cited which would justify a United States Court of Appeals to assume the role of super-canvassing board in a labor-bargaining-agency election.

The language of Mr. Justice Black in National Labor Relations Board v. Falk Corp., 308 U.S. 453, 458, 60 S.Ct. 307, 310, 84 L.Ed. 396, would seem forbidding: "But

Section 9 of the Act vests power in the Board, not in the court, to select the method of determining what union, if any, employees desire as a bargaining agent; to this end, the Board ʻmay take a secret ballot of employees, or utilize any other suitable method to ascertain such representatives.' "

With reference to an election conducted by the Mediation Board under the Railway Labor Act, 45 U.S.C.A. § 151 et seq. our court said: "The Board is by statute vested with great discretion in determining eligibility, and must be conceded to have the power to alter or interpret its own rules." Nashville, C. & St. L. Ry. v. Railway Employees' Department of American Federation of Labor, 6 Cir., 93 F.2d 340, 344.

The National Labor Relations Board would seem to be vested by statute with quite as broad discretion.

The Supreme Court has emphasized more than once the expertness of the National Labor Relations Board in the field of labor controversy; and the Courts of Appeal have been reminded, sometimes sharply, of their curtailed power of review. At this late date renewed citation of these decisions would seem idle. Certainly, if we have understood the Supreme Court's meaning, we are vested with no power to upset the findings and inferences of the Labor Board supported by the evidence in the instant case, even if our views were not in consonance with those of the Board. This, we do not imply; we merely refrain from expression. The order of the National Labor Relations Board, as prayed in its petition, will be enforced.