**CARLISLE PAPER BOX COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD,** Respondent.

No. 17047.

United States Court of Appeals
Third Circuit.

Argued June 7, 1968.

Decided July 17, 1968.

Thomas A. Beckley, Rhoads, Sinon & Reader, Harrisburg, Pa., for petitioner.

Fred R. Kimmel, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frank H. Itkin, Atty., N.L.R.B., on the brief), for respondent.

Before McLAUGHLIN, STALEY and SEITZ, Circuit Judges.

## OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

This case is before the Court on petition of the Carlisle Paper Box Company, hereinafter "Petitioner", pursuant to 29 U.S.C.A. § 160(f) to review and set aside the order of the National Labor Relations Board, hereinafter "Board", and the cross-petition of the Board pursuant to 29 U.S.C.A. § 160(e) to enforce its order in full.

In essence, the Board adopting the decision of the Trial Examiner found that petitioner's tactics in connection with a union [1] organizational campaign and election violated Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1). The Board also found that petitioner violated Section 8(a) (3) of the Act, 29 U.S.C.A. § 158(a) (3), in discharging one Genevieve Morin, an employee of petitioner, because of her union activities and, further, that petitioner violated Section 8(a) (5) of the Act, 29 U.S.C.A. § 158(a) (5), by refusing to bargain with the union after it had been duly certified as the exclusive bargaining representative of petitioner's employees.[2]

The Board's order requires that petitioner cease and desist from all activities found violative of the Act, offer rein-

---

1. United Glass and Ceramics Workers of North America, AFL-CIO.

2. The pertinent statutory provisions read as follows:
 29 U.S.C.A. § 158
 "(a) it shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *

 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

statement to Mrs. Morin with reimbursement of her lost earnings and bargain collectively with the union. Petitioner resists compliance with the foregoing contending that the election should be set aside in light of the union's campaign activities and misrepresentations and because of the alleged arbitrary and capricious acts of the Regional Director in the conduct of his investigation of petitioner's objections and in his failure to resolve challenged ballots. Petitioner also contends the evidence of record fails to establish violations of Sections 8(a) (1) and (3) of the Act.

On July 22, 1966, the union filed a Petition for Certification of Representation with the Fourth Region of the Board. This resulted in the execution of an Agreement for Consent Election which was approved by the Regional Director and provided for an election to be held on August 30. The union held five meetings during August and elected officers. During this same time, George Tay, petitioner's president, approached several employees in an effort to determine their sympathies concerning the union. Tay told several employees that if the union won the election petitioner would lose one of its largest customers and he would discharge fifteen employees. Tay created the impression among some of his employees that he had planted a spy in the union meetings who informed him about employee activities. President Tay also promised his employees benefits such as 13 or 18 cents more if the union lost the election.

The election was held on August 30 as scheduled and resulted in a vote in favor of the union. Petitioner challenged the result and the Regional Director set it aside and ordered a new election on the ground that the union had distributed a facsimile official ballot market in favor of the union. A second election was scheduled for October 11.

After the first election Tay approached one Charles Laughman, an employee, and told him he knew he had voted for the union and indicated to Laughman that if the union won the second election, he would have to be laid off. In addition petitioner promulgated formal work rules and erected a bulletin board on which they were posted. One such rule required that if employees were absent, they were to call in on the first day off and report why they were out and when they would be back. They were required to bring a doctor's note on their first day back. Also posted was a notice that forbid any soliciting from outside organizations on company property. The notice required that any employee who was so approached had to report it and stated that failure to report would result in dismissal.

Another innovation occurring after the first election was the use of warning slips that were issued to employees for alleged infractions of petitioner's rules. Although standing alone the use of warning slips and the posting of notices might fit in with personnel management practice, the Board found on the basis of substantial evidence that these practices were directly related to the fact that the union had won the first election and were introduced as retaliatory measures which restrained and coerced employees in violation of their rights under Section 7 of the Act and thereby constituted violations of Section 8(a) (1).

Much evidence was adduced concerning the discharge of Mrs. Morin. Petitioner sought to show that she was a poor worker who was absent from work 23% of the time, had violated petitioner's rules and threatened President Tay, and, therefore, petitioner had ample cause to discharge her. The view of Mrs. Morin's discharge as presented by the Board's counsel indicated that she was hired on April 27, 1966 and was considered a good employee. Shortly after the union meeting held on August 8, Tay accused her of being a union officer and threatened that she would be one of the fifteen employees fired if the union won the election. On August 16, Tay observed Mrs. Morin talking with other employees and singled her out for a reprimand. On September 1, two days after the first union election, Mrs. Morin became ill shortly after re-

porting for work and went to the ladies' lounge to lie down. When Tay learned of this, he sent his secretary to the lounge to tell Mrs. Morin to go to work. Tay asked Mrs. Morin why she had not punched out her time card to indicate that she was not working, and she replied that she was unable to walk to the time-clock because she felt ill. Tay remained in Mrs. Morin's work area for about two hours and during this period told her she could be fired for not ringing out. When Mrs. Morin replied that he was picking on her, he wrote out the first formal warning slip issued by petitioner. Mrs. Morin again became ill about noon that day and determined to go home. The following day she returned with a doctor's excuse.

On September 14, Tay again observed Mrs. Morin talking with other employees and he issued a second warning slip to her. Tay admitted he did not overhear the conversation. However, the warning slip indicated that a repetition of the offense would result in her dismissal.

On September 16, Tay went to the timeclock area at quitting time. He observed Mrs. Morin and another employee at the bulletin board and approached them. Mrs. Morin testified that Tay hit her twice at this point. This was denied by Tay who contended that he touched Mrs. Morin on the shoulder to attract her attention. The incident resulted in the filing of a charge of simple assault against Tay which was dismissed by the Court of Quarter Sessions of Cumberland County, Pennsylvania.

For our purposes the significance of this incident was its use in the union election campaign. Petitioner claims that the union greatly exaggerated and misrepresented the facts in handbills distributed to the employees accusing Tay of injuring Mrs. Morin. Furthermore, petitioner contends that Mrs. Morin's appearance in a "medical" collar while distributing leaflets to the employees and her subsequent appearance at the second election wearing the collar while she cast a challenged ballot constituted an interference with the employees' exercise of a free choice.

The second election was held on October 11. The vote was 21 votes for the union and 18 against it with 5 additional challenged ballots, 3 by petitioner and 2 by the union. Pursuant to the terms of the consent election agreement, the Regional Director conducted an investigation of the challenged votes. He sustained the three challenges presented by petitioner but did not pass on the union's challenges on the ground that they could not affect the outcome of the election. The union was thereafter certified as the collective bargaining representative of petitioner's employees. Petitioner filed exceptions to the Regional Director's report with the Board but was notified on November 23, that it was the Board's policy not to intervene when parties to a consent election agreement disapprove of the judgment exercised by the Regional Director.

After its certification the union requested recognition and bargaining. When petitioner refused, the Board's General Counsel issued a complaint charging a violation of the Act.

 As indicated above the record is replete with evidence that petitioner threatened employees with discharge and layoffs, interrogated employees concerning union sentiments, promised pay increases if the union lost the election, promulgated new and stringent work rules and discharged Mrs. Morin. Although petitioner offered explanations for these activities which if accepted by the Board would mitigate the charge of unfair labor practices, the Board chose to believe otherwise. Our review of the record indicates ample justification for the Board's decision based on substantial evidence. 29 U.S.C.A. § 160(e); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Buitoni Foods Corp., 298 F.2d 169, 171 (3 Cir. 1962).

"We cannot conclude that the findings of fact are not supported by substantial evidence merely because the Trial Ex-

aminer may have believed the testimony offered by General Counsel and rejected as unbelievable, or lacking in persuasive weight, the evidence offered by the respondent."

Beyond doubt the aforementioned activities constitute violations of the Act. International Telephone and Telegraph Corp. v. N. L. R. B., 382 F.2d 366 (3 Cir. 1967), cert. denied, 389 U.S. 1039, 88 S. Ct. 777, 19 L.Ed.2d 829 (1968); N. L. R. B. v. Frank C. Varney Co., 359 F.2d 774 (3 Cir. 1966); N. L. R. B. v. Wings & Wheels, Inc., 324 F.2d 495 (3 Cir. 1963); N. L. R. B. v. Lester Brothers, Inc., 301 F.2d 62 (4 Cir. 1962); N. L. R. B. v. Barney's Supercenter, Inc., 296 F.2d 91 (3 Cir. 1961); N. L. R. B. v. Epstein, 203 F.2d 482 (3 Cir. 1953), cert. denied, 347 U.S. 912, 74 S.Ct. 474, 98 L.Ed. 1068 (1953); N. L. R. B. v. Nina Dye Works Co., 203 F.2d 849 (3 Cir. 1953), cert. denied, 346 U.S. 875, 74 S.Ct. 127, 98 L.Ed. 383 (1953).

Confronted with the substantial evidence rule petitioner argues that the Trial Examiner erred in not striking the testimony of three employee witnesses on the grounds that counsel for the Board failed to produce statements of these witnesses until a few days after they had testified. It is contended that this failure constituted error under Section 102.-118 of the Board's Rules and Regulations which provides in pertinent part:

" * * * After a witness called by the general counsel has testified in a hearing upon a complaint under section 10 (c) of the act, * * * the respondent may move for the production of any statement of such witness in possession of the general counsel, if such statement has been reduced to writing and signed or otherwise approved or adopted by the witness. Such motion shall be granted by the trial examiner. If the general counsel declines to furnish the statement, the testimony of the witness shall be stricken * * *." 29 C.F.R. 102.118.

Our review of the record regarding this objection reveals that petitioner suffered no prejudice. Counsel for the Board when asked to produce the statements indicated that he did not recall having them. When they were discovered a few days later, they were tendered to petitioner's counsel and the Trial Examiner offered to recall the witnesses for further cross-examination. The opportunity was declined by petitioner. No bad faith was shown in the Board counsel's inability to produce the statements when first requested. Under these circumstances it was not error for the Trial Examiner to refuse to strike the testimony in question. Dwight-Eubank Rambler, Inc. v. N. L. R. B., 380 F.2d 141, 145 (9 Cir. 1967); N. L. R. B. v. Seine and Line Fishermen's Union of San Pedro, 374 F.2d 974, 979 (9 Cir. 1967), cert. denied, Biazevich v. N. L. R. B., 389 U.S. 913, 88 S.Ct. 239, 19 L.Ed.2d 261 (1967).

As previously indicated the union and petitioner had entered into a consent-election agreement which provided, inter alia, that the Regional Director's decision as to questions of voter eligibility and the manner in which the election was conducted would be "final and binding." In this context the applicable standard of review is limited.

"Where the parties to a representation proceeding have entered into a consent-election agreement, such as we have here, the scope of review is subject to the restrictive limitations imposed by the agreement, and the representation certification may not be set aside except upon proof that the action of the Board, or the Regional Director, was arbitrary and capricious. N. L. R. B. v. General Armature & Mfg. Co., 3 Cir. 192 F.2d 316, cert. den., 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357; N. L. R. B. v. J. W. Rex Company, 243 F.2d 356, 358 (3rd Cir. 1957); Diversey Corporation v. N. L. R. B., 325 F.2d 489, 491 (7th Cir. 1963); N. L. R. B. v. Parkhurst Manufacturing Company, 317 F.2d 513, 516, 517 (8th Cir. 1963); N. L. R. B. v. Sumner Sand & Gravel Company, 293 F.2d 754 (9th Cir. 1961); Elm City Broadcasting Corp. v. N. L.

R. B., 228 F.2d 483, 485 (2nd Cir. 1955). Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis. This court, and others, have heretofore held that 'something more than error is necessary to spell out arbitrary or capricious action.' N. L. R. B. v. J. W. Rex Company, supra, 243 F.2d 358, and the cases therein cited; N. L. R. B. v. Parkhurst Manufacturing Company, supra, 317 F.2d 518. The fact that on the same evidence a reviewing court could have reached a decision contrary to that reached by the agency will not support a determination that the administrative action was arbitrary and capricious." N. L. R. B. v. Jas. H. Matthews & Co., Industrial Mark. Prod. Div., 342 F.2d 129, 131 (3 Cir. 1965), cert. denied, 382 U.S. 832, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965).

█ Reviewing the actions of the Regional Director in light of the above we find that his determinations were not arbitrary or capricious. Since the union conceded the three challenged votes raised by petitioner, it was proper for the Regional Director to sustain them. We find no breach of any mandatory duty imposed on the Regional Director in his refusal to resolve the remaining two challenges since, as he concluded, they could not affect the election results.

█ Furthermore, the Regional Director's ruling concerning the pre-election conduct on the part of the union does not rise to the level of arbitrary or capricious action. Mrs. Morin's appearance in a medical collar was not a misrepresentation in as much as the record indicates that she wore the collar at the direction of a doctor who examined her immediately after the incident with President Tay on September 16. Furthermore, petitioner had and took advantage of an opportunity to outline its side of the Morin-Tay incident in response to union handbills when it presented its "skit" to assembled employees. The Regional Director concluded that the union's preelection campaign was conducted within per-

missible limits and, therefore, not sufficient reason to set aside the election. The National Labor Relations Board had announced its rule for determining whether an election should be set aside.

"We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election. However, the mere fact that a message is inartistically or vaguely worded and subject to different interpretations will not suffice to establish such misrepresentation as would lead us to set the election aside. Such ambiguities, like extravagant promises, derogatory statements about the other party, and minor distortions of some facts, frequently occur in communication between persons. But even where a misrepresentation is shown to have been substantial, the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election. For example, the misrepresentation might have occurred in connection with an unimportant matter so that it could only have had a de minimis effect. Or, it could have been so extreme as to put the employees on notice of its lack of truth under the particular circumstances so that they could not reasonably have relied on the assertion. Or, the Board may find that the employees possessed independent knowledge with which to evaluate the statements." Hollywood Ceramics Company, Inc., 140 NLRB 221, 224 (December 20, 1962). (Footnotes omitted).

Our review of the record satisfies us that the Regional Director applied the above standard in concluding that the election should not be set aside.

We have reviewed the other objections raised by petitioner and find them without merit.

A decree will be entered enforcing the Board's order. The Board will submit a proposed form of decree.